Filed 12/31/15  In re J.M. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.M. et al., Persons Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH & SOCIAL SERVICES DEPARTMENT,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>J.M.,<br><br>          Defendant and Appellant. | A145519<br><br>(Solano County<br>Super. Ct. Nos. J42220, J42221) |

J.M. (Mother) appeals orders of the juvenile court denying her request for additional reunification services with her two sons, J.M. and D.N. (collectively, Minors), and terminating her parental rights to them.  She contends that the court abused its discretion in denying further services and that the children would benefit from continuing their relationship with her.  We shall affirm the orders.

## I.  BACKGROUND

The Solano County Health & Social Services Department (the Department) filed a juvenile dependency petition on behalf of Minors in October 2013.  At the time, J.M. was five years old and D.N. was two years old.  The petition alleged Mother had a history of substance abuse, she was unable to care for Minors because of her substance abuse and transient lifestyle, she had a history of unresolved mental health needs, she had been

diagnosed with bipolar disorder, anxiety, and attention deficit disorder but had failed to seek ongoing treatment, she used methamphetamines to treat her mental health issues, and she was currently incarcerated. The petition also alleged that J.M.'s alleged father (Father) had a history of substance abuse from which he had not recovered and that it impaired his ability to care for J.M., that he had been arrested numerous times, and that he was currently incarcerated and unable to care for J.M. According to the petition, D.N.'s alleged father had abandoned D.N. at age two months and refused to care for him.[1]

## A. Detention Report

The Department filed a detention report in October 2013. A social worker had met with Mother, who had described her drug use and mental health history. Mother had been using methamphetamines " 'on and off' " since she was 13 years old, but she had stopped in 2006 or 2007 when she became pregnant with her oldest child, a daughter. She had an emotional breakdown in 2007 or 2008 because she was overwhelmed by the demands of caring for her daughter, and was placed on a mental health hold at a hospital. During her hospitalization, she was diagnosed with bipolar disorder and prescribed psychotropic medications; however, she stopped using her medications shortly after she was released from the hospital. She was later diagnosed with attention deficit disorder and prescribed medication. She took her medications for six months, but stopped receiving mental health treatment because she lost her health insurance. Mother began using methamphetamines again in 2010, reportedly because she was unable to maintain stable housing, and continued to do so until she became pregnant with D.N. in 2011.

Mother told the social worker she resumed caring for J.M. and her older daughter after her pregnancy with D.N., who was born in September 2011, but that they became homeless after she was asked to leave her residence. She entered a homeless shelter, "Opportunity House," but was asked to leave. She then left Minors in the care of their

---

[1] Neither alleged father is a party to this appeal. Because of his greater involvement in the facts relevant to this appeal, we shall refer to J.M.'s alleged father as "Father."

2

former child care provider in April 2013.[2]  Mother began using methamphetamines again in June 2013.  She told the social worker she had been arrested for carjacking and kidnapping in August 2013.  Mother was incarcerated, awaiting trial.

Mother acknowledged that she was inattentive to her children's needs due to her attention deficit disorder.  She stayed in bed for long periods of time, left piles of dirty laundry around her home, and had difficulty maintaining a clean house.  She relied heavily on an aunt and uncle to help care for the children.  Mother was receiving mental health treatment in jail and wanted to remain on her psychotropic medications.

Father told the social worker he and his mother (Grandmother) had cared for J.M. for nearly two years in the past and that Mother had been granted "split custody" of J.M in 2012.  He had only recently learned that Minors had been with their childcare provider, L.H., since April.

Grandmother reported that when J.M. and his older sister were in Mother's care, their clothes were constantly dirty.  Grandmother took care of them five or six times a week.  When they went to Grandmother's house, she would immediately bathe them. The sister told Grandmother she could not bathe at Mother's house because there were too many flies in the bathtub.

The children constantly begged for food when they visited Grandmother's house. J.M. had appeared malnourished when he was one year old.  Mother gave him juice instead of baby formula when he was younger, and he had 15 cavities at the age of three years.

Grandmother told the social worker that in 2008, Mother's home was dirty:  there were piles of dirty clothes, trash, and dirty diapers in the children's living quarters, the house smelled of spoiled milk and urine, the kitchen countertops were piled with dirty dishes, the stove was covered in grease and spilled food, and there was no food in the refrigerator, freezer, or cabinets.

---

[2] She also arranged for her older daughter to stay with the daughter's paternal grandmother.  The older daughter's grandmother became her legal guardian, and the daughter is not involved in this dependency case.

Grandmother told the social worker that Mother had been unable to maintain stable housing. Mother had left J.M. in Father's care in 2010, and was absent from his life for nearly two years. She moved in with her aunt when she was pregnant with D.N. and brought J.M. and his older sister to live with her. She was asked to leave her aunt's residence in April 2013, went to Opportunity House, and was asked to leave within the first week. She then left Minors in the care of their childcare provider, L.H. Grandmother and her husband (Grandfather) brought J.M. to live with them in September 2013.

Grandmother also explained that Father struggled with drug addiction and would go on extended " 'drug binges,' " disappearing for months.

The childcare provider, L.H., told the social worker she had cared for Minors for about five months. Mother was homeless and unable to care for them. During this time, Mother rarely followed up to see how the children were doing, and L.H. was unable to contact her. L.H. reported that when Minors were in Mother's care, their clothing and skin were dirty and they had bad body odor. J.M. appeared thin and malnourished, and Mother had left D.N. on the front porch of L.H.'s home because he would not stop crying.

Mother was arrested for carjacking and robbery in late August 2013. According to the police report, she and a man approached a woman who was in her car with her daughter and asked to use her phone. When the victim told them she did not have a phone, Mother lifted her shirt and showed her a knife on a sheath on her belt. Mother told the victim not to scream and threatened to take her child and car keys. The second suspect held a metal pry tool in his hand and had a knife in a sheath on his belt. The victim was able to escape when another vehicle pulled up.

Father had recently been arrested for possessing and transporting controlled substances. D.N.'s father was not involved in the child's life and did not want reunification services.

The juvenile court ordered Minors detained.

4

## B. Jurisdiction

At the time of the November 2013 jurisdiction report, J.M was placed with Grandmother, and D.N. was placed with his former child care providers, L.H. and D.D. Father had recently been sentenced to prison for possession of a controlled substance.

The social worker interviewed J.M., who told her he felt safe with Grandmother and with the child care provider, L.H., and that he sometimes felt safe with Mother.

A February 2014 addendum report noted that Mother expected to be released from jail either later that month or in April 2014. She said that due to medical problems, she had not been able to participate in any services.

The juvenile court sustained the allegations of the petition, took jurisdiction of Minors, and ordered reunification services for Father and Mother, but not for D.N.'s father.

## C. Six-Month Status Review

D.N.'s caregivers, L.H. and D.D., filed a request to be appointed D.N.'s de facto parents in July 2014. They stated that D.N., then two years old, had lived with them for more than half his life, that he had taken to calling them "[M]ommy" and "[D]addy" without encouragement, and that he believed them to be his parents. L.H. and D.D. were willing to adopt D.N.

Grandmother and Grandfather asked to be appointed J.M.'s de facto parents. In their request, they noted that he had lived with them "the better part of his life." They were willing to adopt him.

The Department prepared a report for the August 2014 six-month review hearing. Mother had been released from custody and was living in a residential treatment center. She had made progress in the program, but had repeatedly violated the program's rules and engaged in "attempted secret relationships." She performed some work through the residential program to gain job skills. She had begun to seek assistance in obtaining permanent housing. She was participating regularly in an outpatient substance abuse treatment program and was making good progress. She was participating in mental health services and was taking medications. At the time of the report, Mother had one

unsupervised afternoon visit and one overnight visit with Minors each week, and she had been visiting them consistently.

Father remained imprisoned. J.M. remained with his paternal grandparents and D.N. with L.H. and D.D. Minors had regular visitation with each other.

At the six-month review hearing, the juvenile court found Mother had made adequate progress toward alleviating or mitigating the causes necessitating placement, Father had made minimal progress, and D.N.'s father had made none. The court continued Minors in out-of-home placement and continued reunification services. At a later hearing, the court granted the requests of Grandmother and Grandfather to be named J.M.'s de facto parents and of L.H. and D.D. to become D.N.'s de facto parents.

## D. Twelve-Month Review

The 12-month status review was scheduled for December 2014. The Department's status review report stated that Mother had been "transient and without stable housing" during the reporting period. She left the residential treatment program on August 6, 2014, apparently blaming personnel at the program for telling the Department that she had broken rules and was not ready to have Minors returned to her. For the next two weeks, the Department did not know Mother's whereabouts, Mother did not arrange visitation with Minors, and she did not attend her outpatient substance abuse treatment program. On August 21, 2014, she informed the Department that she was living with a friend in Fairfield, but she did not provide contact information or an address.

On October 31, 2014, Mother was detained by the Fairfield Police Department for public intoxication. Her probation officer told a social worker Mother had violated her probation by being terminated from her substance abuse treatment program, having a positive drug test for alcohol in October 2014, and being arrested for public intoxication. She was taken into custody for the probation violation on December 1, 2014.

The report explained that Mother had participated well in her substance abuse treatment from April until early August 2014 but that after she left the residential center, her attendance at the outpatient substance abuse program began to decline and she had "periods of relapses." She was placed on an attendance contract at the outpatient

6

program in September 2014; she made some improvements, but failed to comply with her attendance contract and was terminated from the program on October 31, 2014. Mother entered a detoxification center in early November 2014, and entered a residential substance abuse treatment program later that month.

Mother was not employed, and as of the time the report was written in December 2014, she had moved into a substance abuse residential treatment program and was on the waiting list for a housing voucher.

Mother's visitation with Minors had reverted to supervised visitation because of her homelessness and substance abuse relapse. Her interactions with Minors were consistently positive. She played games with them, drew with them, talked with them, brought snacks and beverages, and ate with them. She set limits and praised good behavior. Minors seemed happy during the visits and responded well to her directions. Mother acknowledged she was not ready to have Minors returned to her care.

J.M. was six years old, and was meeting developmental milestones and performing satisfactorily in school. He was seeing a therapist, who stated that he needed "structure, stability, and predictability." He appeared stable and comfortable in his grandparents' house and had a positive attachment to them. D.N., three years old, was also meeting developmental milestones. His caregiver reported that he needed "constant reassurance of where he belongs and who he is," asking questions such as " 'are you mine?' ", " 'do you love me?' ", and " 'is this my house?' " He had lived with L.H. and D.D. for nearly two years and was attached to them. He often showed physical affection for D.D. and told him, " 'I love you [D]addy.' "

The Department concluded that both Mother's and Father's progress had been minimal and that there was no substantial probability that an extension of services to 18 months would result in Minors reunifying with either parent. The Department therefore recommended that reunification services be terminated and hearing pursuant to Welfare and Institutions Code[3] section 366.26 be set.

_____

[3] All statutory references are to the Welfare and Institutions Code.

A contested hearing took place on January 27, 2015. The social worker assigned to the case testified that Mother had been living in the residential drug treatment program since November 20, 2014 and appeared to be sober. The social worker noted, however, that Mother had a pattern of not maintaining her sobriety when out of a structured setting. Mother was taking her medications and had attended some visits with Minors. However, there had been lapses in the visitation schedule when her whereabouts were unknown for two weeks in August, when she was in detoxification for two weeks in November, and when she was incarcerated for a few days in December 2014. Mother's counselor at the residential treatment program testified that Mother was complying with all the program's guidelines and rules and attending all her courses and counseling sessions. Her drug tests had been negative.

On January 28, 2015, the juvenile court terminated reunification services and set the case for a section 366.26 selection and implementation hearing. In doing so, the court acknowledged that Mother had made progress in her treatment program, but concluded it could not find there was a substantial probability Minors could be returned to her by 18 months from the time they were removed.

## E. Section 366.26 Hearing and Request for Modification of Order

### 1. Section 366.26 Report

The Department's May 2015 report for the section 366.26 hearing explained that Mother had told a social worker she had graduated from the 90-day residential treatment program on March 18. After she was released, she stayed at a homeless shelter, then with her mother for a couple of weeks before entering the "City Church" program, where she initially reported she would be able to live for up to a year. In early May, however, she told the social worker she had left City Church because the staff was " 'unprofessional' " and she was "yelled at and disrespected" there. She was currently living in Sacramento with the father of her daughter. Staff at the City Church program told the social worker Mother had left of her own accord because her daughter's father had offered her a room free of charge. Mother took another client of the program with her when she left, but the other client returned to City Church, reporting that Mother's new residence was a

8

" 'crank house'; a house where people use drugs." Mother wanted Minors returned to her care and opposed a plan of adoption.

Father, who had been released from prison, was reported to be homeless, and the social worker's efforts to contact him had been unsuccessful. Grandmother reported that Father had come to accept the plan of adoption.[4]

J.M was healthy, was developing normally, was doing well in school, and was well cared for at his grandparents' home. He was participating in weekly therapy. He seemed "stable, comfortable, and adjusted" with his grandparents and was attached to them. They wanted to adopt him and provide him with a permanent home. They had been referred for an adoption home study. When asked where and with whom he would like to live, J.M. responded by saying, "Here, with my Pop [Grandfather] and Grandma." Grandmother was willing to have J.M. continue his contact with his maternal grandmother and siblings after adoption, and was open to J.M. having supervised contact with Mother and Father.

D.N. was also healthy and developing normally and was well cared for by his caregivers, L.H. and D.D. He was participating in weekly mental health services, but he did not appear to need to continue with the therapy. He referred to L.H. and D.D. as his "[M]om" and "[D]ad." He showed physical affection by hugging and kissing them and told them he loved them. L.H. and D.D. wanted to adopt D.N., and the Department had made a referral for an adoption home study. L.H. and D.D. supported D.N. remaining in monthly contact with his maternal grandmother and maternal half-siblings, and were also open to contact between D.N. and Mother by letter or telephone.

Since reunification services were terminated, Mother had been offered fewer visits with Minors. She was offered two visits per month in February and March 2015, but missed one of the March visits. She was offered one visit per month in April and May 2015. She cancelled her April visit because her ride from Sacramento " 'fell through.' " She behaved appropriately during visits and tried to engage with the children.

---

[4] D.N.'s father continued to have no involvement with D.N. and had told several social workers he could not raise D.N. and wanted to sign over his parental rights.

9

J.M. interacted and engaged with Mother during visits. Grandmother reported that J.M. continued to have "anger issues," which became worse after his visits with Mother. After each visit, he would become more angry and upset, kick the door, and stomp on the floor. Mother used to call J.M. every week, but had not called since the last court date in January 2015. The social worker asked J.M about his visits with Mother, and he told her he did not like visiting her because she " 'feeds us bad food,' " such as Lunchables with candy. He initially told the social worker he did not like anything about the visits, but eventually said he liked playing and that he liked playing on Mother's phone during visits.

D.N. did not appear to have much of a bond with Mother and took some time to warm up to her. During the visits, D.N. talked about his "Daddy," D.D., and asked for his "Mommy [L.]," L.H. L.H. and D.D. told the social worker that D.N. did not ask for Mother and did not identify her as his mother. They reported that during one of the visits, when Mother told D.N., "Mommy missed you," D.N. replied that he already had a Mommy, referring to L.H. When D.D. took D.N. to visits with Mother, D.N. would ask him why he was going to the visits.

2. *Section 388 Petition and Hearing*

Mother's counsel filed petitions pursuant to section 388 to change the court's order terminating reunification services on the grounds she had completed her residential program in mid-March, was maintaining her sobriety by attending support meetings, was taking her medications, was seeking employment, had enrolled in school, and had moved in with her mother. The court considered the section 388 petition in conjunction with the contested section 366.26 hearing on June 16, 2015.

The court considered the section 388 petition first. Mother testified that she was in an inpatient treatment program when reunification services were terminated in January 2015 and that she graduated from the program on March 18, 2015. She spent a few days in a shelter, then entered the City Church program. She remained at City Church for two weeks, but left because she felt the staff was unprofessional and disrespectful. She then went to Sacramento to live with her daughter's father, and was in Sacramento for about

10

two months. She denied that the house was a "crank house," and also denied knowing that other people there used drugs. She originally testified that she left the house in Sacramento because her daughter's father returned to the home after failing to complete a residential program and she believed he compromised her sobriety. On cross-examination, she acknowledged that she had recently called her mother and told her she had been kicked out of his house. Mother spent two nights in her car before she could contact her mother to ask for a place to live; she then moved in with her mother, with whom she was living at the time of the hearing.

While at the inpatient program, Mother had developed a relapse prevention plan, and she had been in contact with her sponsor every day since graduating. Mother testified that she had been sober since November 5, 2014. She tried to attend Alcoholics Anonymous or Narcotics Anonymous meetings at least once a day. However, as of the date of the June 16 hearing, she had attended only three meetings in June.

Mother testified she had not visited with Minors since mid-April. Her visits had decreased after reunification services were terminated, and she had noticed that the boys had become more distant with her during the visits since that time. She testified that J.M. would greet her by hugging her and saying, "Hi, Mom," and that D.N. would call her "Mama [J.]." Minors used to have trouble separating from her at the end of visits, but they no longer did.

Minors had last been in Mother's custody in March 2013. Mother acknowledged that D.N. had lived half his life with L.H., and said she would not want him to make a rapid transition back into Mother's care. There had also been an earlier period that J.M. lived away from Mother for about a year, when he was two years old. Mother testified that J.M. had asked her several times when he could come and live with her.

Mother testified she was looking for work and had re-enrolled in community college. She was taking her psychiatric medications. She was making efforts to enroll in an after-care substance abuse program.

A social worker testified that Mother was still in a "very unstable situation" and that there was no record of her completing any drug testing since she graduated from the

11

residential program on March 18. She testified that the social worker who supervised Mother's visits with Minors had indicated J.M. had never expressed the wish to live with Mother. She agreed, however, that Mother showed affection to Minors during their visits and that J.M. reciprocated her affection, while D.N. was slower to warm up to her. J.M. considered his grandparents' house his home. D.N. considered L.H. and D.D. his parents. The social worker believed it would be detrimental to delay J.M.'s permanent placement with his grandparents or to remove D.N. from his current home.

The juvenile court denied Mother's petition to reinstate reunification services. The court commended Mother for completing her residential program and setting appropriate goals for herself. However, the court noted, Mother had not visited Minors regularly, had not achieved a stable living situation or employment, had not attended an after-care substance abuse program, and had not given any proof that she had complied with drug testing.

*3. Section 366.26 Hearing*

The section 366.26 selection and implementation hearing immediately ensued. Mother testified that she was concerned that if Minors were adopted, their adoptive parents would not allow her to maintain contact with them. She did not want Minors to be adopted, and she wanted the opportunity to regain custody of them at a later date.

The juvenile court found that Minors were likely to be adopted, that Mother had not shown she had had regular and consistent visitation with Minors over the course of the dependency, and that she had not shown that the benefit of maintaining the parent-child relationship outweighed the benefits of adoption. The court therefore terminated the parental rights of Mother, Father, and D.N.'s father, and ordered a plan of adoption.

**II. DISCUSSION**

**A. Denial of Section 388 Petition**

Mother contends the trial court abused its discretion in denying her section 388 petition to reinstate reunification services. She points out that she had successfully completed the residential substance abuse treatment program and had a relapse prevention plan, she was attending support meetings and taking her medications, she was

12

seeking employment and had re-enrolled in college, she was living with her mother, and she was making plans to attend an after-care substance abuse program. These efforts, she argues, show changed circumstances, and she contends the juvenile court therefore abused its discretion in refusing her request for further services.

"A dependency court order may be changed or modified under Welfare and Institutions Code section 388 if a petitioning parent establishes one of the statutory grounds, changed circumstance or new evidence, for the modification, and also proves the proposed change would promote the best interests of the child. [Citations.] The parent requesting the change of order has the burden of establishing that the change is justified. [Citation.]" (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.)

In determining whether the party has made the requisite showing, the court considers "the seriousness of the reason for the dependency and the reason the problem was not overcome; the relative strength of the parent-child and child-caretaker bonds and the length of time the child has been in the system; and the nature of the change in circumstances, the ease by which the change could be achieved, and the reason the change was not made sooner." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 446–447.) After termination of services, "the focus shifts from the parent's custodial interest to the child's need for permanency and stability." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685; accord *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) The grant or denial of the petition rests in the juvenile court's sound discretion, and its decision will not be disturbed on appeal absent a clear abuse of that discretion, that is, a showing that the court's determination was arbitrary, capricious, or patently absurd. (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.)

Applying these standards, we must uphold the juvenile court's order. Mother had a long pattern of drug abuse and instability, and despite her commendable recent efforts, she had not yet shown that she could maintain sobriety and a stable living arrangement outside the structured setting of a residential program. Meanwhile, Minors had been out of her custody for more than two years at the time of the hearing, and indeed, they had each lived apart from her for approximately half of their young lives. Although Mother

13

behaved appropriately and affectionately during visits and J.M. in particular showed affection in return, the evidence shows they looked to their caregivers, rather than to her, to fill the role of a parent and meet their needs. Minors were bonded to their respective caretakers and they considered their caretakers' houses their homes. Moreover, Minors' respective caretakers were committed to adopting them and giving each a permanent home, and there was evidence that it would be detrimental to Minors to deprive them of that stability. The juvenile court did not abuse its discretion in denying Mother's section 388 petition.

## B. Termination of Parental Rights

Mother contends the juvenile court erred in not applying the section 366.26, subdivision (c)(1)(B)(i), exception to termination of parental rights because she and Minors share a loving bond and Minors would benefit from continuing a parent-child relationship with her.

Where reunification services have failed and a hearing pursuant to section 366.26 is held, the court must determine whether the child is likely to be adopted; if so, with limited exceptions, the court must terminate parental rights and order the child placed for adoption.[5] (§ 366.26, subd. (c)(1).) Under section 366.26, subdivision (c)(1), the denial of reunification services "shall constitute a sufficient basis for termination of parental rights" unless "(B) [t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. . . ." The parents have the burden of proving the applicability of the beneficial relationship exception. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*).)

The *Autumn H.* court recognized that "[i]nteraction between natural parent and child will always confer some incidental benefit to the child." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "To meet the burden of proof, the parent must show more than

---

[5] Mother does not challenge the juvenile court's finding that Minors are adoptable, and the record clearly shows that they are likely to be adopted.

frequent and loving contact, an emotional bond with the child, or pleasant visits." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) The beneficial relationship exception applies only when the relationship with the natural parent "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and sense of belonging a new family would confer." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Only if "severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed [is] the preference for adoption . . . overcome [so that] the natural parent's rights are not terminated." (*Ibid.*) The existence of this relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Id.* at p. 576.)

There is some conflict in the courts of appeal as to the proper standard of review of a juvenile court's finding on whether one of the exceptions to adoption applies. (See *Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575–577 [substantial evidence standard applies to finding on the applicability of beneficial relationship exception]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying abuse of discretion but recognizing difference in standards not significant]; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 [applying combination of both standards].) We agree with *Jasmine D.* that the practical differences between the two standards in evaluating the beneficial relationship exception are not significant. (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.) On the record before us, we would affirm the court's finding under either standard.

The record fully supports the juvenile court's determination that the beneficial relationship exception did not apply. At the time of the selection and implementation hearing, J.M. was six years old and D.N. was three years old, and both had lived away from Mother for approximately half their lives. Mother had visited Minors fairly

15

regularly during most of the dependency and behaved appropriately and affectionately, but she had not seen them for two months or more at the time of the section 366.26 hearing. There is no indication Minors turned to Mother to meet their physical or emotional needs. D.N. asked why he was going to visits, he was slow to warm up to Mother at the visits, he referred to his caregivers as "Daddy" and "Mommy [L.]," and he told Mother he already had a Mommy, L.H. Although J.M. showed more affection for Mother, there is also evidence that he showed increased problems with anger after seeing Mother. J.M. told a social worker he did not like visiting Mother, although he eventually said he liked playing at the visits.

Against the limited benefit from these visits, the juvenile court properly weighed the benefit Minors would receive from adoption. The children's respective caregivers were committed to adopting them and giving each a permanent home. J.M. had expressed the wish to continue living with his "Pop" and "Grandma," and he considered their house his home. His therapist had opined that he needed "structure, stability, and predictability." D.N. had lived with L.H. and D.D. since he was a year and a half old, viewed them as his mother and father, and was happy in their care. This record fully supports the juvenile court's conclusion that the relationship between Minors and Mother did not constitute a "compelling reason" to determine that termination of parental rights would be detrimental to Minors. (§ 366.26, subd. (c)(1)(B)(i).)

### III. DISPOSITION

The orders appealed from are affirmed.

16

_____
Rivera, J.

We concur:


_____
Reardon, Acting P.J.


_____
Streeter, J.